**HELMS, Aaron, Appellant,**

v.

**HEWITT, Lowell D., Supt.; Kyler, B. B., CO III; Stotelmyer, R. E., Major; Smith, B. K., Counselor III; Hileman, K. R., Farm Manager; Erhard, D. R., Deputy Supt. for Treatment; Henry, T. W., Director of Treatment; Mateer, W. W., C. I. Manager.**

No. 80–2393.

United States Court of Appeals, Third Circuit.

Argued February 26, 1981.

Decided June 30, 1981.

Richard G. Fishman (argued), Keystone Legal Services, Inc., State College, Pa., for appellant.

Francis R. Filipi, Deputy Atty. Gen. (argued), Harvey Bartle, III, Atty. Gen., Harrisburg, Pa., for appellees.

Before GARTH and ROSENN, Circuit Judges, and MILLER, Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In this appeal we are asked to adjust the tensions between the necessity for efficient and orderly administration of state prisons on the one hand and the protection of important constitutional interests of their inmates on the other. The plaintiff, Aaron Helms, filed this action in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C. § 1983 (1976) requesting damages and injunctive and declaratory relief against certain officials of the State Correctional Institution at Huntingdon, Pennsylvania ("SCI Huntingdon"). He claims that he was placed in a restrictive custody status for 51 days without being afforded the procedural safeguards established by state regulations or required by due process. He also asserts that the adjudication of institutional charges against him was constitutionally tainted by the substantive use of critical hearsay testimony relating information allegedly obtained from an unidentified informant. The defendants were granted summary judgment by the district court, and plaintiff appealed pursuant to 28 U.S.C. § 1291 (1976). We reverse.

### I.

On December 3, 1978, a general disturbance occurred at SCI Huntingdon in which several guards were injured. With the assistance of state and local police the prison staff quelled the disturbance that same evening. The prisoners in general population were confined to their cells until the next

---

* The Honorable Jack R. Miller, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

day, when the prison returned to normality. Plaintiff Helms was removed from his general population cell at approximately 10:00 p.m. on December 3, interviewed by the state police, and placed in restrictive custody.[1]

On December 4, 1978, Helms was given a copy of Misconduct Report Number 90908, which charged him with assaulting corrections officers and disrupting normal institutional routine during the previous evening. On December 8, 1978, Helms appeared before an institutional Hearing Committee ("HC"), an administrative panel charged with adjudicating misconducts. 37 Pa. Code § 95.103(c).[2] The Hearing Committee Report indicates that no determination concerning Helms' guilt was made at that time "due to insufficient information." The report also directs that Helms "[c]ontinue in Restrictive Housing Unit, Investigation under the provisions of Administrative Directive 004." The directive to which the report refers establishes procedures to be employed when inmate conduct violates not only institutional regulations but also the state penal code. This proffered authority for continuing Helms in restrictive custody status deals with situations in which the state police have been called in for investigative assistance. It reads, in pertinent part:

IV. **PROCEDURE WHEN STATE POLICE NOTIFIED**

A. . . .

1. The Pennsylvania Bureau of Correction has established four classes of restrictive custody that are relevant to this case. These are, from least restrictive to most restrictive: Close Administrative, Close Disciplinary, Maximum Administrative, and Maximum Disciplinary. 37 Pa. Code § 95.107. The criteria for confinement in an Administrative Custody classification will be discussed in detail *infra*. Confinement in Disciplinary Custody is reserved for those inmates that have been convicted on misconduct charges. 37 Pa. Code § 95.106(2). It is definitional, then, that Helms was in Administrative Custody from December 3, 1978, to January 22, 1979, when he was found guilty of committing a misconduct.

2. The December 8, 1978, HC was composed of three prison officials who are not named as defendants in this action.

B. Pending arrival of the State Police, the institutional representative shall:

1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security. A hearing complying with BC–ADM 801 [37 Pa. Code § 95.103[3]] will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible.

BC–ADM 004 at IV(B)(1) (Bureau of Correction Administrative Directive, *issued* Nov. 15, 1972, *amended* Aug. 5, 1975). As we have observed, the state police had interviewed Helms on December 3, just prior to his confinement in restrictive custody. Because the police investigation was incomplete, the HC apparently believed that the section 95.103 hearing should be delayed.

Eight days after Helms was placed in restrictive custody, the Commonwealth filed criminal charges against him, charging him with assaulting Corrections Officer Rhodes and riot. On January 2, 1979, the plaintiff appeared before an institutional Program Review Committee (PRC) composed of defendants Erhard, Henry, and Mateer. Although a PRC may serve as an appellate forum for review of HC decisions, the January 2 body sat in its capacity as a status review agency. As such it was charged with evaluating the circumstances of in-

3. This section provides the general framework to be used in dealing with inmate misconduct. It requires that Misconduct Reports be filed in the event of serious rules violations, providing further that the inmate who is the subject of the Misconduct Report must be given a copy of the report as soon as possible (within three hours if placed in prehearing confinement). The rule establishes the Hearing Committee whose function has been described in the text. Subsection (d)(1) of the rule directs that "[t]he inmate shall be informed in writing of the charge and given a specific date for a hearing, which shall be held not less than 24 hours after receipt of this notice but within six days."

mates in restrictive custody and making recommendations on their future confinement. These status reviews were to be made at least weekly and were to involve a personal interview of the inmate every 30 days. 37 Pa.Code § 95.103(g). After reviewing Helms' circumstances, the PRC recommended that he remain in Administrative Custody. The PRC members indicated in affidavits to the district court that they adopted this course of action because they understood that a preliminary hearing on the state criminal charges was scheduled for the following day. Superintendent Lowell Hewitt, also named as a defendant in this action, concurred in the PRC's recommendation to continue Helms in restrictive custody. The preliminary hearing on the state criminal charges took place on January 10 and the criminal proceedings were "continued." In the meantime, Helms had not been afforded the hearing provided for by state regulations on the misconduct charge.

On January 19, 1979, plaintiff was given a copy of another Misconduct Report (number 90986), charging him with striking Sgt. Phillips, a corrections officer at the facility, during the disturbance of December 3, 1978. This Misconduct Report had been prepared by Lt. Buddy Kyler, a defendant to this action, based on "information from confidential informants."

On January 22, 1979, an HC composed of defendants Stotelmyer, Smith, and Hileman convened a hearing on the latest misconduct charge. The only evidence presented in support of these charges was the testimony of Lt. Kyler, who related what he had allegedly been told by informants. For safety reasons, the alleged informants were not identified, either to the defendant or to the members of the HC. The HC found Helms guilty on these charges (No. 90986) and sentenced him to six months in Disciplinary Close Custody, effective December 3, 1978. The HC Report of January 22, 1979, also contains the following statement: "NOTE: This finding and disposition concludes action on misconduct #90908, heard Dec. 8, 1978 without conclusion."

The Commonwealth dropped the criminal charges against Helms on February 6, 1979.[4] He has, since the events detailed above, been paroled from the correctional facility.

## II.

Helms' complaint propounds three theories under which he alleges he was denied the protections of the Due Process Clause of the fourteenth amendment. First, he claims that the prison treatment he received from December 3, 1978, to January 22, 1979, did not comply with the procedures established by the Pennsylvania Bureau of Correction's regulations. The process mandated under state law, Helms claims, was the process that was "due" under the fourteenth amendment. Failure of state officials to afford him the process is thus alleged to be a denial of his federal constitutional rights.[5]

Second, plaintiff claims that the state's prison regulations created for him an expectancy or entitlement that he would not be placed in restrictive custody absent conduct on his part meeting specific criteria established by those regulations. This expectancy or entitlement, he asserts, rose to the level of a state-created liberty interest of which Helms could be deprived only by constitutionally mandated "due process of

---

4. Helms' complaint alleged that the charges were dropped on January 6, 1979, and that allegation was not denied initially. The defendants did amend their answer to deny the allegation, however, and fixed February 6, 1979, as the dismissal date in the affidavits accompanying their motion for summary judgment. Plaintiff's opposing affidavit did not dispute the February date and the district court therefore correctly used February 6, 1979, as the date of dismissal. Fed.R.Civ.P. 56(e).

5. Because we resolve the issues in this case concerning Helms' prolonged administrative detention under the plaintiff's second theory, we do not reach the issue whether a failure of state officials to comply with state procedural regulations constitutes a deprivation of federal procedural due process.

law." Under Helms' theory such process includes a determination, within a reasonable period of time, whether his conduct met the regulatory criteria. Helms claims that the fifty-one days spent in restrictive custody prior to a hearing on the merits of his detention amounted to a denial of his state-created liberty interest without due process.

Finally, Helms shifts his attack from his prolonged administrative confinement to the procedural regularity of his eventual disciplinary hearing. He attacks the January 22, 1979, finding of guilt as resting on a hearsay account of uncorroborated information garnered from a single unidentified informant. He alleges that the HC heard no evidence of. the informant's motive, credibility, or trustworthiness on which to base a reasoned evaluation of his information. Helms asserts that when information is presented in such a manner, it is so lacking in reliability that to predicate a finding of guilt and disciplinary sanctions on it contravenes principles of fundamental fairness implicit in the Due Process Clause.

Before answering plaintiff's complaint, defendants moved to dismiss it or, alternatively, for summary judgment. The motion was referred to a United States Magistrate who recommended that it be granted. Relying on *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Hodges v. Klein,* 562 F.2d 276 (3d Cir. 1977), the magistrate concluded that transfer to Administrative Custody infringed no interest protected by the fourteenth amendment. He treated Helms' challenge to the use of information from an unidentified informant as an assertion of a right to confrontation and a right to counsel and summarily disposed of these contentions on the authority of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The district court declined to adopt the magistrate's recommendations and denied the defendants' motion without prejudice to renewal. In a memorandum opinion, it thoughtfully concluded that the magistrate had given *Meachum* and *Montanye* an over-ly-broad reading in light of the Supreme Court's action in *Enomoto v. Wright,* 434 U.S. 1052, 94 S.Ct. 1233, 55 L.Ed.2d 756 (1978), *aff'g mem.* 462 F.Supp. 397 (N.D. Cal.1976). Pretrial proceedings continued and, at the close of discovery, both parties moved for summary judgment. At that time, the district court granted the defendants' motion. We presently review that judgment.

### III.

In the opinion announcing the grant of summary judgment in favor of the defendants, the district court addressed each of plaintiff's three theories of liability. First, the court held that no interest protected by the fourteenth amendment was implicated by Helms' confinement in Administrative Custody. Second, it concluded that the state officials had complied in all respects with state law in dealing with the plaintiff's alleged involvement in the December 3, 1978, incident. Third, the court reasoned that because Helms had no right to confront or cross-examine witnesses at his disciplinary hearing, the HC's reliance on information secured from an unidentified informant was not improper.

### A. The Nature of the Interest at Stake

In granting defendants' motion for summary judgment, the district court reversed its earlier holding that "due process does require a hearing prior to the transfer of a prisoner from the general population to a confinement whose conditions are more onerous than those encountered in the general population, absent unusual circumstance . . . ." *Helms v. Hewitt,* Civ. No. 79–950, slip op. at 4 (M.D.Pa. Nov. 9, 1979) (memorandum opinion denying defendants' motion to dismiss). That earlier holding had been based on statements in *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal.1976), *aff'd mem.,* 434 U.S. 1052, 94 S.Ct. 1233, 55 L.Ed.2d 756 (1978), which may be read as holding that the Constitution of its own force recognizes a liberty interest on the part of inmates not to be "transferred from the general prison population to the grossly

more onerous conditions of maximum security." 462 F.Supp. at 402. The district court retreated from this position, however, in light of the intervening Supreme Court decision in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), which, it believed, "limited [*Wright*] to its factual basis in California law." *Helms v. Hewitt*, Civ. No. 79–950, slip op. at 2 (M.D.Pa. Aug. 15, 1980).

Because all of Helms' theories are predicated on violations of the Due Process Clause, the district court correctly focused its attention on whether a deprivation of "life, liberty, or property" had occurred. *See* U.S. Const. Amend. XIV, § 1. If the interest being infringed by the State is not of constitutional dimension, no process is due upon its deprivation. However, we believe the district court may have acted improvidently in retreating from its original position holding that such an interest existed. The Supreme Court's decision in *Vitek* necessitated a re-examination of the district court's initial analysis of *Wright* in this case. It may even fairly be read to contradict that analysis. However, as we demonstrate *infra*, it does not foreclose Helms' claims as a matter of law and, in fact, sets forth a clear mode of analysis to be employed in evaluating those claims.

We look first to the substance of Helms' claims to identify the interests he alleges were infringed. Helms does not contend that his initial segregation in Administrative Custody on the night of December 3, 1978, should have been preceded by due process. He concedes that it is established law in this circuit that prison authorities may, in exigent circumstances, place inmates in restrictive custody without affording prior notice and hearing. *Biagiarelli v. Sielaff*, 483 F.2d 508, 511 (3d Cir. 1973); *Gray v. Creamer*, 465 F.2d 179, 185 n.6 (3d Cir. 1972). Further, Helms' objection to his eventual confinement in Disciplinary Custody is narrow: the HC ultimately determined his guilt on the basis of a mere hearsay account of the uncorroborated story of an unidentified informant. The remainder of his due process claims challenge the legality of his continuous confinement in Administrative Custody between December 3, 1978, and January 22, 1979. He contends that the confinement deprived him of a "liberty interest" and that such deprivation should have been accompanied by procedural safeguards greater than those afforded by the December 8 HC proceeding and the January 2 PRC status review. Our task, then, is to determine (1) whether Helms' administrative segregation from December 3, 1978, to January 22, 1979, infringed a valid liberty interest, and (2) whether, as a result of the disciplinary proceedings conducted January 22, 1979, Helms was denied a protected liberty interest.

Recent Supreme Court decisions have indicated that inmates' liberty interests stem from two sources. The first is state law, under a theory comparable to the "entitlement" theory of property. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 752 (1975) (public education); *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (tenured employment); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits). Under this theory, a prisoner's interest in his liberty gains constitutional protection when the State, by statute, rule, or regulation, provides that the liberty will not be infringed except upon the occurrence of specified events. Thus, that quantum, or "expectancy," of liberty that is embodied in a prisoner's "good-time credits"—which the State has granted and has indicated will not be removed unless the prisoner engages in serious misconduct—cannot be impaired without affording at least minimal due process. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A similar analysis led to the requirement that due process attend the revocation of parole, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), or probation, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). *Vitek v. Jones*, 445 U.S. at 488, 100 S.Ct. 1261.

The second source of liberty interests is less easily defined. At one time, a majority of the Supreme Court looked to

**494**

the Constitution itself as a source of protected liberty interests. *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). An insistent minority, however, argued that liberty is a natural right of man, and that the Constitution serves only to limit the sovereign's power to intrude on that liberty. *Id.* at 230, 96 S.Ct. at 2541 (Stevens, J., dissenting). Recently, the Court appears to have moved in this direction, for it has returned to a more familiar test to ascertain whether a liberty interest exists: does the action of the state threaten to impose a "grievous loss" on the individual. *Vitek v. Jones,* 445 U.S. at 488, 491–94, 100 S.Ct. at 1261, 1263–1264. *See Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600; *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Whatever their roots, the interests protected under this theory are seen to be of such fundamental importance that the State need not expressly recognize—indeed, is precluded from denying—their existence for them to be cloaked with constitutional protection. Whether the Constitution serves as a positive grant of liberty, as suggested by the majority in *Meachum,* or whether the individual enjoys a natural right to liberty protected by the Constitution, as claimed by the *Meachum* minority, it is undisputed that the Constitution itself requires that due process accompany an attempt to infringe on certain important rights.

Because confinement in Disciplinary Custody involves a determination of guilt, the notion that due process must attend such confinement is readily accepted. The district court measured Helms' claim of due process deficiencies in his disciplinary hearing against the constitutional standards of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), thereby implicitly acknowledging that a protectable liberty interest was involved. Even the Supreme Court, in *Wolff* and especially in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), seemed almost to assume the implication of a liberty interest when an inmate is subject to disciplinary proceedings on allegations of "serious misconduct." *See Wolff v. McDonnell,* 418 U.S. at 571 n.19, 94 S.Ct. at 2982; *Baxter v. Palmigiano,* 425 U.S. at 323, 96 S.Ct. at 1560. *See also Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). As we show *infra,* Pennsylvania follows the norm in reserving Disciplinary Custody for inmates found guilty of serious misconduct and has therefore clearly created a liberty interest in its inmates not to be confined in Disciplinary Custody. Defendants concede as much in their brief and the State appears to have recognized its constitutional obligations by establishing an extensive procedural framework to be used in dispensing discipline. *See* 37 Pa.Code § 95.103.

One tends to be less willing to recognize an inmate's liberty interest in avoiding administrative confinement, however, even though the conditions of administrative confinement are not substantially different than those experienced in disciplinary confinement. This reluctance stems from the observation that administrative confinement is often used to maintain control in a volatile environment—to quench sparks before they become flames. Indeed, it was such a precautionary measure that accounted for Helms' initial segregation. Some correctional officials may say that they should not be entangled in procedural maneuvers when, in their informed judgment, a dangerous situation requires segregation of a particular inmate. Keeping these legitimate concerns in mind, we proceed to an examination of the district court's conclusions on this issue and an analysis of the relevant law.

The district court's original conclusion that Helms had stated a cause of action concerning his administrative confinement rested on its reading of *Wright* to recognize a liberty interest, arising from the operation of the Constitution itself, in an inmate not to be transferred from the general population to more onerous confinement. The court reached its conclusion after finding that segregation of an inmate in Administrative Custody constitutes a " 'severe impairment of the residuum of liberty which

he retains as a prisoner.'" *Id.* at 3 (quoting *Wright v. Enomoto,* 462 F.Supp. at 402, aff'd mem., 434 U.S. 1052, 94 S.Ct. 1233, 55 L.Ed.2d 756 (1978)). As we have noted above, *see supra* at 493, the court later retreated on this point.

We agree with the district court that *Vitek* cast substantial doubt on the earlier holding that prisoners have an interest of purely constitutional origin in avoiding confinement in Administrative Custody. However, the district court opinion gives no indication that the court looked to Pennsylvania law to determine whether a liberty interest arose from that source. We believe that such an examination was imperative under *Vitek.*

In *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal.1976), a three-judge district court ruled that due process should have been afforded California inmates who were transferred, for administrative reasons,[6] from the general prison population to a maximum security unit within the same facility. That decision was summarily affirmed by the United States Supreme Court. 434 U.S. 1052, 94 S.Ct. 1233, 55 L.Ed.2d 756 (1978). As noted earlier, it was this decision that first prompted the district court in the instant case to deny the defendants' motion to dismiss and to hold that due process protections were required before Helms could be detained in restrictive custody.

The *Wright* court held that California inmates had a constitutionally protected liberty interest not to be placed in maximum security absent collision with institutional standards. The court found the interest to be created by a state regulation which provided:

Inmates must be segregated from others when it is reasonably believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated

for medical, psychiatric, disciplinary, or administrative reasons. The reason for ordering segregated housing must be clearly documented by the official ordering the action at the time the action is taken.

462 F.Supp. at 403 (emphasis deleted). The court held that fixing conditions for segregation of inmates created a protectable liberty interest that warranted the protections enumerated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). These procedures, the court said, are "essential if the inmate is to have any chance whatever to prove that he does not represent a risk to the security of the institution." 462 F.Supp. at 403.

The Supreme Court's subsequent decision in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), involved the transfer of a Nebraska prison inmate to a state mental hospital. A three-judge district court, finding a protectable interest in both state law and the Due Process Clause itself, had held that procedures similar to those enumerated in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), were required before the transfer could be accomplished. *Miller v. Vitek,* 437 F.Supp. 569, 574 (D.Neb.1977). Except for the requirement that counsel be provided, the Supreme Court affirmed the district court's analysis and decision in all respects.

The Court held that Nebraska had created a liberty interest by statutorily restricting transfers to mental hospitals to only those cases in which "a prisoner 'suffers from a mental disease or defect' that 'cannot be given proper treatment' in prison." 445 U.S. at 489, 100 S.Ct. at 1261 (quoting Neb.Rev.Stat. § 83–180(1) (1976)). The Court held that the case was not controlled by *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), which had held that no process was due on interfacility transfers of

---

**6.** The plaintiffs had been confined in maximum security for a variety of reasons, including "becoming too militant ..., spending too much time in the yard by [themselves]," 462 F.Supp. at 400, being " 'an influencial [sic] member of

the Mexican Prison Community' [and] 'having leadership qualities,' " *id.* at 401, and being "suspected of being a leader in Nuestra Familia," *id.*

prisoners. The transfers in those cases, the Court observed, "were discretionary with the prison authorities." *Id.* The Court noted that it had contemplated state-created liberty interests concerning solitary confinement in *Wolff v. McDonnell,* 418 U.S. at 571 n.19, 94 S.Ct. 2963, 41 L.Ed.2d 935, and that "[f]ollowing *Meachum v. Fano* and *Montanye v. Haymes* [it had] continued to recognize that state statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement for disciplinary or administrative reasons. *Enomoto v. Wright,* 434 U.S. 1052 [94 S.Ct. 1233, 55 L.Ed.2d 756] (1978), summarily aff'g 462 F.Supp. 397 (ND Cal. 1976)." 445 U.S. at 489, 100 S.Ct. at 1261.

It is clear, then, that the Supreme Court affirmed *Wright* on the ground that California prisoners possessed a state-created liberty interest protectable under the Due Process Clause. Helms claims in the instant suit that Pennsylvania has similarly provided him with a protectable liberty interest through its administrative regulations.

Pennsylvania's prisons are the responsibility of its Bureau of Correction, which has promulgated a comprehensive set of regulations to govern operations of such facilities. 37 Pa.Code pt. III. Sections 95.101 to 95.108 of those regulations are concerned with inmate conduct: enumerating and classifying misconducts, prescribing disciplinary measures, and creating a procedural framework for dealing with violations and maintaining control and security. The effect of these regulations is to limit segregation in Administrative and Disciplinary Custody to particular classes of inmates who meet ob-

jective criteria set out in the rules. Such specifications, we conclude, establish a liberty interest in all inmates to whom the regulations apply not to be segregated in restrictive custody unless the regulatory criteria are met.

As intimated earlier, the regulations clearly restrict confinement in Disciplinary Custody, as distinguished from Administrative Custody, to "inmates found by the Hearing Committee to have committed Class 1 Misconducts." 37 Pa.Code § 95.106(2). *See also* 37 Pa.Code § 95.103(f)(1)(iv) (excluding confinement in Administrative or Disciplinary Custody as a permissible sanction for committing a Class 2 Misconduct). This regulatory scheme follows precisely the reasoning of the Supreme Court in *Wolff v. McDonnell* in which the Court noted that "solitary confinement . . . is normally imposed only when it has been claimed and proved that there has been a major act of misconduct." 418 U.S. at 571–72 n.19, 94 S.Ct. at 2982. In such a situation, the Court held, "there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction." *Id.*

The inmates' interests in avoiding confinement in Administrative Custody are no less real. "The purpose of placing an inmate in [Administrative Custody is] to maintain the safety of the institution by segregating an individual who poses a threat to other inmates, to staff, or to himself, poses an escape risk, or needs protection from other inmates." 37 Pa.Code § 95.107(a)(1).[7] The members of the January 2 PRC so understood the regulations.

---

7. In accord with the stated purposes of Administrative Custody, quoted in the text, the Bureau of Correction has specified four instances in which an inmate may be confined in Administrative Custody. All four grants of authority contain substantive criteria to be applied in determining whether such confinement is appropriate; each reinforces our finding that the State has conditioned administrative confinement on the occurrence of specified events and has thus created a liberty interest. For example, Administrative Directive 004, quoted in pertinent part *supra* at 490, allows transfer to

Administrative Custody if "necessary to maintain security." Section 95.104(b)(1) provides for administrative detention, pending a disciplinary hearing, of inmates alleged to have committed a Class 1 Misconduct, if such detention is warranted by the "need for control." *See* note 8 *infra.* Section 95.104(b)(3) authorizes administrative confinement in an investigative status if "there is a threat of a serious disturbance or a serious threat to the individual or others." Finally, Section 95.104(b)(4) provides for an administrative "protective custody" upon request of the inmate.

In their affidavits to the district court, all three claimed to have based their decision to continue Helms in restrictive custody on their determination that he represented a threat to security. The similarity of these regulations to the one relied on by the court in *Wright* is apparent. *See* p. 495 *supra.* Equally apparent, as in *Wright,* is that some procedural safeguards are "essential if the inmate is to have any chance whatever to prove that he does not represent a risk to the [safety] of the institution." *Wright v. Enomoto,* 462 F.Supp. at 403.

Defendants argue that they are invested with greater discretion under the regulations than was possessed by the defendants in *Wright* and that, therefore, *Wright* is inapposite. It is true, as defendants note, that the regulation relied on in *Wright* established criteria of inmate conduct which, when met, *required* segregation. We do not find this to be a meaningful distinction, however, for neither Helms nor the *Wright* plaintiffs complained of being left out of segregation when they met all conditions for such confinement. Neither regulatory scheme confers discretion on officials to place inmates in segregation if their conduct or circumstances do not warrant it, and the lack of procedures designed to prevent unwarranted segregation form the crux of the prisoners' claims.[8]

■ We are persuaded that *Wright* is the appropriate controlling precedent and conclude that Helms' segregation and continuation in Administrative Custody infringed a protected liberty interest. Therefore, we must conclude that the entry of summary judgment in favor of defendants was error, for it was predicated on the non-existence of such a liberty interest.

Helms, however, requests not only a reversal of the entry of summary judgment against him, but asks us to review the record and, on the basis set forth in his argument, direct the entry of summary judgment in his favor. Inasmuch as most of the facts presented by the record before us are undisputed,[9] such a direction would be proper if all *material* facts were properly established in support of Helms' motion for summary judgment. We therefore proceed to an examination of relevant law to determine what facts are material to the issue whether Helms received the process he was due when he was confined in Administrative Custody and when he was convicted of a Class 1 Misconduct.

### B. What Process Was Due?

■ It is elementary that one deprived of life, liberty, or property, as embraced by the Due Process Clause, is entitled to procedures designed to protect against arbitrary and erroneous official action. The extent and nature of those protections, unlike the existence of the protectable interest, *see Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), depends in large measure on the "weight" to be assigned the interest being

---

8. We also reject any argument that a finding of a liberty interest is precluded by the operation of 37 Pa.Code § 95.104(b)(1), which provides:

> (1) An inmate who has allegedly committed a Class 1 Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of [disciplinary] procedures . . . .

Committing the determination of objective criteria to the subjective evaluation of a particular official neither affects the creation of a protectable interest nor satisfies the requirements of the Due Process Clause. *Vitek v. Jones,* 445 U.S. at 490 & n.6, 100 S.Ct. at 1262 (citing *Arnett v. Kennedy,* 416 U.S. 134, 166–67, 94

S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) (opinion of Powell, J.), *id.* at 177–78, 94 S.Ct. at 1655–66 (opinion of White, J.), *id.* at 210-11, 94 S.Ct. at 1672–73 (opinion of Marshall, J.)).

9. The defendants have not disputed that the procedures afforded Helms from December 3, 1978 to January 21, 1979 were as he has described them: written copies of two Misconduct Reports on December 4 and January 19; an appearance before an HC on December 8 at which Helms was told that he was under investigation and would remain in restrictive custody; a status review by a PRC on January 2 at which Helms was merely interviewed and told he would remain in restrictive custody; and a concurrence in the PRC's decision by the institutional superintendent.

infringed. The two interests at issue in the instant case—the right not to be confined in Administrative Custody and the right not to be confined in Disciplinary Custody—are very similar. Yet, as the preceding section has demonstrated, their sources in the regulations differ and, in several real respects, their deprivations work different hardships. Therefore, we treat separately the issue of what process must accompany the deprivation of each.

### 1. The Procedure to Effect Administrative Detention

Relying on this court's decision in *Hodges v. Klein*, 562 F.2d 276 (3d Cir. 1977) (per curiam), defendants argue that, by providing periodic "status reviews," they had satisfied the requirements of the Due Process Clause for confinement. *Hodges*, decided before the Supreme Court's summary affirmance of *Wright*, held: "The presence in this case of procedures for periodic hearing to review an inmate's assignment to the [Management Control Unit] leads us to conclude that appellant's due process rights were adequately safeguarded." *Id.* at 278.

We are not persuaded by defendants' argument for two reasons. First, the quoted holding of *Hodges* was predicated on the application of *Meachum* and *Montanye* to *intrafacility* transfers. No search was made for a state-created liberty interest. Thus, it is not clear that *Hodges* required *any* due process in connection with the transfers. Second, the opinion of the district court in *Hodges* makes clear that "status reviews" were not the only procedural safeguards employed in connection with the assignment of prisoners to segregated housing. The inmates were given prior notice of the proposed administrative action and were informed of the criteria on which the decision would ultimately be based. A hearing was held at which the inmate appeared, counsel substitute was made available, and evidence offered from both sides was received. Finally, the inmate received written notification of the decision and the reasons underlying it. *Hodges v. Klein*, 421 F.Supp. 1224, 1233 (D.N.J.1976), *aff'd*, 562 F.2d 276 (3d Cir. 1977) (per curiam). Thus, *Hodges* does not restrict the procedural protections to which Helms was due to "status reviews."

Having concluded that *Hodges* does not control the outcome of this suit, the immediate question before us remains what process is due an inmate in restrictive custody for administrative reasons when such segregation infringes a state-created liberty interest. We note again that the thrust of Helms' constitutional complaint is that he was denied a timely hearing on whether he was properly confined in Administrative Custody. In other words, having been deprived of a liberty interest by his administrative confinement, Helms claims he was entitled to procedural due process to determine whether he fell within that class of inmates subject to segregation for administrative reasons under State regulations. If, for example, the December 8 HC was correct in describing Helms' detention as "pursuant to Administrative Directive 004," *see supra* at 490, due process was required to determine whether Helms' continued segregation was "necessary to maintain security." If, as the district court found, Helms was being detained pursuant to 37 Pa.Code § 95.104(b)(3), he was entitled to a fair determination that there existed "a threat of a serious disturbance or a serious threat to [Helms] or others." Or, if Helms was confined under the authority of 37 Pa.Code § 95.104(b)(1) for having allegedly committed a Class 1 Misconduct, prison officials were required to determine, through due process, that the confinement was necessitated by "the need for control."

Turning then to the legal issue at hand, it is well to recall at this time the concerns noted earlier dealing with the importance of swift and decisive action when using administrative detentions to maintain control and security at a penal institution. Sympathetic as we are to these concerns, we are also charged with interpreting and applying the Constitution. Although the liberty interest in this analysis is a creation of the State, the minimum protections appropriate to its deprivation are "a matter of federal law [and] they are not diminished

by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Vitek v. Jones*, 445 U.S. at 491, 100 S.Ct. at 1261. To determine the degree of flexibility accorded state prison officials in this context, we turn first to the federal law announced in *Wright* as most nearly on point.

■ *Wright* serves to alleviate some of the above-mentioned concern because its holding clearly demonstrates an awareness that "due process" does not always mean "prior process." *Wright* held that in connection with administrative confinement the prisoner is entitled to (1) written notice of the proposed action before or within 48 hours of the initial placement in administrative confinement, and (2) a fair hearing before an administrative factfinder within 72 hours of initial segregation, unless additional time is requested by the inmate. Helms was provided with written notice and a copy of the charges against him within 24 hours of his initial segregation and there is no complaint concerning the adequacy or timeliness of this notice. As to the 72-hour limit for a hearing, we do not consider the Supreme Court's summary affirmance to hold that any hearing held after 72 hours is constitutionally impermissible. Although summary affirmances are controlling on us until the Court indicates otherwise, *Hicks v. Miranda*, 422 U.S. 332, 344–45, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975), we are not to read into the Court's action any more than was necessary to sustain the judgment of the district court. *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83, 99 S.Ct. 983, 989, 59 L.Ed.2d 530 (1979). We find it especially noteworthy that the time limits established by the *Wright* district court were not mentioned in the Questions Presented section of the state's jurisdiction-al statement to the Court, *Enomoto v. Wright*, No. 77–504, 46 U.S.L.W. 3325 (U.S. Nov. 15, 1977). *See Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 52 L.Ed.2d 199 (1977). We *do* accept as Supreme Court law the holding of *Wright* that due process protections must be afforded inmates detained in administrative confinement and that the basic procedures to be followed in such a situation are the same prescribed for disciplinary proceedings in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).[10]

*Wolff* did not decide what constitutes a timely hearing. However, in *Gray v. Creamer*, 465 F.2d 179 (3d Cir. 1972), we considered the procedural due process right of prisoners in a state institution to a hearing before transfer from the general population to solitary confinement. We held that normally minimal due process required a hearing before transfer, but in certain exigencies, such as a prison riot, a hearing could be delayed a reasonable period of time. *Id.* at 185 n.6. In *Biagiarelli v. Sielaff*, 483 F.2d 508 (3d Cir. 1973), a case involving a prisoner held in investigative status for an alleged escape plot, we indicated that the time for notice and hearing might depend upon when the threat to the institution subsided. "[W]hat is reasonable must be measured against the urgency of the circumstances necessitating the action." *Id.* at 512. In *Braxton v. Carlson*, 483 F.2d 933 (3d Cir. 1973), we held that under "near mutiny" conditions at one of our federal correctional facilities, segregated confinement for three days awaiting hearings was not unreasonable under the circumstances. But we concluded that absent unusual circumstances necessitating emergency measures, further incarceration under segregated conditions without hearings would not have been justified. *Id.* at 973.[11]

---

10. We emphasize the use of the term "basic" in the text. As did the district court in *Wright*, see 462 F.Supp. at 403–04, we express our belief that indeterminate periods of confinement in Administrative Custody may require even greater protections (not unlike, perhaps, existing status reviews) than fixed term detention in Disciplinary Custody.

11. The *Wright* court also held that notice and hearing could be postponed in the event of a "continuing emergency." 462 F.Supp. at 405. We think it appropriate to note that the regulations of the Pennsylvania prison system contemplate administrative placement primarily as a preventive measure. *See* 37 Pa.Code §§ 95.-103(b)(1) & (3). *See also* BC–ADM 004, quoted

**500**

■ Thus, under the prevailing law of this circuit, a prisoner transferred to solitary confinement is entitled to a hearing prior to his confinement or, if exigent circumstances exist, within a reasonable time thereafter. In the cases discussed above, this court required a hearing to determine whether the charges leading to segregation were valid. In the context of Helms' administrative detention, we are concerned with whether he was properly classified as a security risk. Today we hold that an inmate confined in Administrative Custody, and thereby deprived of a state-created liberty interest, must be afforded a hearing, as described in *Wright* and *Wolff*, either before the confinement or, in exigent circumstances, within a reasonable period thereafter. The purpose of the hearing is to determine whether the criteria for detention in Administrative Custody have been met.

However, where an inmate is administratively segregated to await a disciplinary hearing, it would appear that such a hearing, if held within a reasonable time after his confinement and if it adjudicated the inmate's guilt or innocence on the underlying misconduct charge, would also be dispositive of the propriety of any continued administrative segregation. Defendants in the case at bar contend such a disciplinary hearing was held on December 8, but it was not concluded because the investigation was incomplete. It is unrealistic, they assert, to return a suspected perpetrator of prison violence to the general population simply because his hearing must be delayed. Although the defendants' position seems to us to be at odds with the state regulations, we agree that the defendants' position may be sound. Our holding in this case, however, does not impose a "speedy trial" requirement for prison disciplinary hearings. It does require that an administrative detainee be afforded an opportunity to show that his administrative confinement is not warranted.

The effect of our holding is to declare that Helms was denied due process unless he was afforded a hearing, within a reasonable time of his initial confinement, to determine whether he represented the type of "risk" warranting administrative detention. Helms asserted by affidavit that he was not afforded any hearing on December 8, the only date within a reasonable time of his initial confinement on which Helms was provided any process other than notice. The defendants have not controverted this statement. On the other hand, Helms signed the December 8 HC report indicating that a hearing had been held. Although we would ordinarily not construe such a document strictly against the constitutional interests of a prisoner, other circumstances in this case persuade us that a directed entry of summary judgment is inappropriate.

■ The parties to this case litigated in the district court on the assumption that the true issue in the case was whether Helms was provided a disciplinary hearing in the manner and in the time prescribed by state regulations. The briefing in the district court and before us focused on that issue. Except for plaintiff's reliance on *Wright*, no cogent arguments were presented that Helms was constitutionally entitled to process in addition to the hearing at which his guilt or innocence would be adjudged. It was therefore not unreasonable for defendants to concentrate on demonstrating compliance with the law pertaining to disciplinary hearings, rather than proving that Helms had received a hearing to determine whether he should continue to be restricted pending the investigation. We therefore believe that under such circumstances summary judgment should not be directed against the defendants, and that they should be provided an opportunity to prove that they afforded Helms his constitutional rights before the December 8 HC.

---

in pertinent part at 490 *supra*. We consider it likely that in such situations prison officials will deem it necessary to effect immediate confinement in restrictive custody, regardless of the existence of a "continuing emergency" like

a prolonged riot. So long as notice and hearing are provided within the period required in the text, we perceive no constitutional violation in such a course.

No undue burden will be imposed on either the parties or the district court, because we must remand on the issue of official immunity. On the remand, defendants will have an opportunity to show, if they are able, that they acted in conformance with the law announced in this opinion.

### 2. The Procedures to Effect Disciplinary Detention

We turn now to Helms' claim that he was denied due process when the January 22, 1979, HC found him guilty of committing a Class 1 Misconduct on the strength of Lt. Kyler's hearsay account of an unidentified informant's uncorroborated story. We again note the procedural posture of this case on appeal. We review an order granting defendants' and denying plaintiff's motions for summary judgment.

The record before us clearly indicates that Kyler's testimony was the only evidence presented at the January 22 hearing and it alone provided the basis for the finding of guilt.[12] The record also contains an unchallenged assertion by plaintiff Helms that "the credibility, reliability and factual knowledge of the incident by the alleged informant was never confirmed as set forth in the record [of the January 22 hearing]...."[13] Kyler's affidavit further reveals that he had had in his possession, since January 4, 1979, a notarized statement of the informant implicating Helms in the December 3 disturbance.[14] It does not appear that the HC saw this affidavit or that it was even submitted to them. No member of the HC was advised of the informant's identity and, obviously, no committee member interviewed the informant privately.

These, we conclude, are the facts material to our disposition of this question and we find no genuine issue as to any of them. *Wolff* teaches that in the closely controlled environment inside prison walls, disciplinary procedures must represent a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974. In striking that balance, the Court concluded that confrontation and cross-examination of adverse witnesses were not required, because it believed that "adequate bases for decision" could be established through the use of other procedures. *Id.* at 568, 94 S.Ct. 2980. Development of these procedures, the Court held, should be left "to the sound discretion of the officials of state prisons." *Id.* at 569, 94 S.Ct. at 2981.

Other courts of appeals, faced with claims similar to those pressed here, have read *Wolff* to command almost complete deference to the judgment of prison officials on the need, if any, for administrative inquiry into the credibility and reliability of an informant. *Walker v. Hughes*, 558 F.2d 1247, 1259 (6th Cir. 1977); *McLaughlin v. Hall*, 520 F.2d 382, 384–85 (1st Cir. 1975); *Willis v. Ciccone*, 506 F.2d 1011, 1018 (8th Cir. 1974). *See* Meyers & Rabiej, *Burden of Proof and the Standard of Judicial Review in Prison Disciplinary Hearings Involving Decisions Predicated upon Uncorroborated Hearsay Evidence*, 1979 So.Ill.U. L.J. 535, 545–52. In the cited commentary, the authors contend that these courts have properly employed the "arbitrary and capricious" standard of review, limiting their judicial function to determining whether

---

**12.** The record contains affidavits from defendants Stotelmyer and Hileman conceding this fact. The third member of the committee, defendant Smith, did not submit an affidavit.

**13.** Affidavit of Aaron Helms at 3 (September 11, 1979). A similar assertion appears in ¶ 17 of the Complaint and was denied. When it was repeated in the plaintiff's affidavit, however, defendants proffered only affidavits from Stotelmyer and Hileman, which generally asserted that *Kyler's* testimony was credible, and affidavits from Kyler, which set forth his reasons for

believing the informant to be reliable and credible. At no point, however, do the defendants assert that the reasons underlying Kyler's belief in the validity of the information were presented to the HC.

**14.** At the hearing on January 22, 1979, Kyler testified that he had relied on information from more than one informant. Kyler's affidavit in the district court, however, referred to an affidavit from only a single informant.

*any* evidence was offered in support of the administrative decision. *Id.* at 549–51. Further, they argue that this determination has been, and should be, made without regard to the admissibility of the evidence under legal rules of evidence. *Id.* at 553–56, 558.

We believe, however, that in entrusting to prison officials responsibility for promulgating procedures for arriving at an adequate basis for decision, *Wolff* intended a genuine, even if single, factfinding hearing and not a charade. Although the HC has the discretion to foreclose the presence of witnesses and cross-examination, *Wolff* abjures arbitrary determinations. It therefore commands "a written statement by the factfinder as to the evidence relied on and reasons" for the disciplinary action. If this statement is intended to withstand scrutiny and win respect for prison disciplinary procedures, it must disclose more than a mere "reliance on speculation and facts not in the record." *Gomes v. Travisono*, 510 F.2d 537, 540 (1st Cir. 1974).

The facts of this case portray a state prisoner subjected to disciplinary sanctions entailing a loss of liberty on the strength of, literally, next to no evidence. Kyler's testimony before the committee, as characterized in the affidavits before us, contained absolutely no indicia of reliability imputable to the alleged undisclosed informant. The HC necessarily relied solely on Kyler's assessment of the informant's story and, in so doing, abdicated its mandated responsibility of serving as an independent tribunal. The procedures employed were especially inappropriate in this case because: (1) Kyler had obtained a notarized affidavit from the informant, and (2) Kyler claimed that the informant had provided reliable and corroborating information on previous occasions. None of this minimal information, which might have provided the HC with a basis upon which to judge the informant's credibility, was made known to the committee members.

■ Under the tensions and strains of prison living fraught with intense personal antagonisms, determination of guilt solely on an investigating officer's secondary report of what an unidentified informant advised him, albeit by affidavit, invites disciplinary sanctions on the basis of trumped up charges. A determination of guilt on such a record, with no primary evidence of guilt in the form of witness statements, oral or written, or any form of corroborative evidence, amounts to a determination on the blind acceptance of the prison officer's statement. Such a practice is unacceptable; it does not fulfill *Wolff's* perception of "mutual accommodation between institutional needs and objections" and constitutional requirements of due process. *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974. We realize that in prison disciplinary proceedings hearsay may serve a useful purpose and we do not preclude it. But when the tribunal's task as a factfinder is to evaluate credibility and assess reliability of the evidence presented, this process is "severely hampered" if the tribunal is permitted to rely upon mere conclusory representations. *Bartholomew v. Reed*, 477 F.Supp. 223, 228 (D. Or. 1979). We therefore hold that when a prison tribunal's determination is derived from an unidentified informant, the procedures approved in *Gomes v. Travisono* must be followed to provide minimum due process.

> "(1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement."

510 F.2d at 540.

Thus, Helms suffered a denial of due process by being convicted on a misconduct charge when the only evidence offered against him was a hearsay recital, by the charging officer, of an uncorroborated report of an unidentified informant. Thus, on remand, if the defendants do not estab-

lish official immunity as discussed in Part IV *infra*, the district court should enter summary judgment for Helms on the issue whether he was denied due process in being confined in disciplinary custody.

## IV.

 Although a prisoner may not have any constitutional interest in where he is confined within a correctional facility, we hold that once the State by either statute or rule confers a protectable liberty interest in not being confined in restrictive custody, that interest may not be infringed without affording him the minimal procedural safeguards appropriate to the circumstances as described in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal.1976), *aff'd mem.,* 434 U.S. 1052, 94 S.Ct. 1233, 55 L.Ed.2d 756 (1978). We further hold that a prisoner is denied due process when his conviction on disciplinary charges rests solely on a hearsay report of an unidentified informant's account which offers no basis for an independent assessment of the informant's credibility or reliability. Therefore, it was error to grant defendant's motion for summary judgment.

We are unable to conclude on this record whether the defendants acted reasonably in light of existing law and with the requisite good faith in connection with Helms' confinement in restrictive custody. *See Winsett v. McGinnes,* 617 F.2d 996, 1009 (3d Cir. 1980) (en banc) (construing *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). We therefore leave the issue of official immunity to the district court on remand. Further proceedings will also be required to determine the appropriateness and availability of the requested relief.[15]

The judgment of the district court will be reversed and the cause remanded for further proceedings not inconsistent with this opinion. Costs taxed against appellees.

---

**15.** Neither party has raised or addressed the effect of the enactment of the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. §§ 1997–1997j (Supp.1981). This Act would allow the district court to stay proceedings in this section 1983 action pending exhaustion of state administrative remedies. 42 U.S.C.A. § 1997e(a)(1). Exhaustion may be required, however, only if the state's administrative grievance mechanism has been certified by the Attorney General to comport with the standards of the Act, or the court makes an independent determination that the procedures are sufficient under the Act. 42 U.S.C.A. § 1997e(a)(2). We have not been advised that Pennsylvania's procedures conform with the Act or with the Attorney General's guidelines, *see* 46 Fed.Reg. 3843–52 (January 16, 1981), and are unable to make such a determination on the record before us.