James DRAYTON, Plaintiff,

v.

William B. ROBINSON, et al., Defendants.

Civ. No. 79–1298.

United States District Court, M. D. Pennsylvania.

July 23, 1981.

---

Frederick M. Stanczak, Susquehanna Legal Services, Williamsport, Pa., for plaintiff.

Alexander Hamer, Jr., Francis Filipi, Dept. of Justice, Harrisburg, Pa., for defendants.

OPINION

MUIR, District Judge.

On May 12, 1981, Drayton, while proceeding pro se, filed a motion for summary judgment, accompanied by a brief, as to his claims that he was placed in Administrative Custody and remained in Administrative Custody at the State Correctional Institution at Camp Hill, hereinafter sometimes referred to as "Camp Hill" in violation of his rights to due process under the Fourteenth Amendment. The Defendants filed a brief in opposition to the motion on June 12, 1981. On July 3, 1981, Drayton, by his court-appointed attorney, filed a reply brief. For the following reasons, Drayton's motion will be granted in part.

Two periods of administrative confinement are the subject of Drayton's complaint. The first period covered March 27, 1979 to April 12, 1979 when Drayton was transferred to Camp Hill on a temporary transfer allegedly for the purpose of medical treatment. A hearing was held at Camp Hill on March 27, 1979 to determine Drayton's status and, subsequent to the hearing, Drayton was placed in Administrative Custody status. Drayton was transferred from Camp Hill on April 12, 1979 to stand trial for murder.

Drayton's second period of confinement at Camp Hill began on May 30, 1979 after his conviction in the Court of Common Pleas for Dauphin County on April 19, 1979 of murder and robbery and ended on December 26, 1979 when he was transferred to a place of incarceration in New Jersey. Authorities at Camp Hill were informed that the transfer was because the Dauphin County authorities regarded Drayton as a security risk at their institution. Thereafter Drayton was placed in the Restricted Housing Unit, hereinafter sometimes "RHU", in Administrative Custody status, pending his classification by the Program Review Committee (hereinafter sometimes "PRC"). On June 5, 1979, Drayton received a misconduct report for disrupting institutional routine by creating a disturbance in the RHU and was moved to the Disciplinary Custody section of that unit. On June 6, 1979, Drayton appeared before the PRC and his Administrative Custody status was affirmed on the basis of his behavior at Dauphin County Prison, his prior convictions, pending charges and his behavior in the Restricted Housing Unit.

On June 7, 1979, Drayton received a disciplinary hearing on the charges lodged June 5, 1979 and received a sentence of 30 days in Disciplinary Custody. On July 3, 1979, Drayton's case was reviewed by the PRC and he was transferred from Disciplinary Custody to Administrative Custody. Thereafter, approximately every 30 days until December 26, 1979, Drayton's case was reviewed by the PRC and a decision to continue him in Administrative Custody was rendered.

Drayton seeks summary judgment with respect to several distinct due process issues. With respect to the first period in Administrative Custody, Drayton argues that his rights to due process were violated because (1) he was never given a written statement of reasons and evidence relied on by the Hearing Committee for its decision to place him in Administrative Custody and (2) the reasons for his confinement in Administrative Custody were not among those permitted under applicable regulations. With respect to the second and lengthier period in administrative custody, the record reveals three contentions: (1) that Drayton did not receive a timely hearing after his placement in Administrative Custody, (2) that he was not provided with the required written statement of evidence relied on and reasons for his placement in Administrative Custody and (3) that the Defendants have failed to demonstrate that the substantive reasons for Drayton's incarceration in Administrative Custody satisfied Bureau of Correction Administrative Directive 801.

█ A grant of summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(c). Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the non-moving party. *Goodman v. Mead, Johnson & Co.*, 534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

In any due process case, the Court's first task is to determine whether a deprivation of life, liberty or property, the interests protected by the Fourteenth Amendment, has occurred. *Helms v. Hewitt*, 655 F.2d 487 at 493 No. 80–2393 (3d Cir. June 30, 1981). Drayton contends that Bureau of Correction Administrative Directive 801, which governs institution disciplinary and restricted housing procedure creates a liberty interest protectible by the Fourteenth Amendment. Part VI.A.1 of Administrative Directive 801 provides that the

> purpose of placing an inmate in [Administrative Custody] shall be to maintain the safety of the institution by segregating an individual who poses a threat to other inmates, to staff or to himself, poses an escape risk or needs protection from other inmates. The decision to place an inmate in the custody must comply with . . . IV.B.1., IV.B.3. or IV.B.4.

Those three sections provide for the placement of an inmate in Administrative Custody only if certain objective criteria are met. In *Helms*, the Court of Appeals held that:

> [t]he effect of [this regulation] is to limit segregation in Administrative . . . Custody to particular classes of inmates who meet objective criteria set out in the rules. Such specifications, we conclude, establish a liberty interest in all inmates to whom the regulations apply not to be segregated in restrictive custody unless the regulatory criteria are met. *Helms v. Hewitt*, 655 F.2d 487 at 496 No. 80–2393.

At the time of Drayton's first confinement at Camp Hill he was received under the status referred to by the Bureau of Correction as HVA, signifying that he was being held for various authorities, in this case Dauphin County authorities, pending his trial for murder. The procedures in such HVA cases are set forth in an administrative memorandum dated April 7, 1977 issued by then commissioner, William B. Robinson. Part III C.1. provides that an HVA case received as a medical transfer shall be placed in the hospital or infirmary. Sub-part 2 provides that all other HVA cases shall be placed in Administrative Custody pending a formal hearing to determine their housing status. Sub-Part 3 provides that a hearing shall be held as required by Bureau of Correction Administrative Directive 801. An affidavit submitted by Defendant Patton, then superintendent at Camp Hill, states that when Drayton was received at Camp Hill on March 27, 1979 he was in HVA status. He was placed in hospital isolation status pending classification by the Hearing Committee. The Hearing Committee on March 27, 1979 determined to place Drayton in Administrative Custody where he remained until he was transferred to Dauphin County for trial on or about April 12, 1979. Since Drayton was placed in Administrative Custody on March 27, 1979, the Court's inquiry must be whether that decision was made in accordance with due process of law.

In *Helms* the Court of Appeals held that before an inmate may be placed in Administrative Custody he is entitled to the same "basic" procedural protections established by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), for inmates facing disciplinary proceedings. *Helms v. Hewitt*, 655 F.2d 487 at 499 No. 80–2393. Among the procedural rights enjoyed by an inmate in Drayton's situation was a "written statement by the factfinders as to the evidence relied on and the reasons for the . . . action." *Wolff v. McDonnell*, 418 U.S. at 564, 94 S.Ct. at 2978. The Supreme Court explained that such a written statement is necessary because of possible collateral consequences to the inmate "based on a misunderstanding of the nature of the original proceeding" and because a written record "helps to insure that administrators, faced with possible scrutiny by state officials and

the public and perhaps even the courts . . . will act fairly." *Wolff v. McDonnell*, 418 U.S. at 565, 94 S.Ct. at 2979. Drayton, therefore, was entitled to a written statement of evidence relied on and of the Hearing Committee's reasons for placing him in Administrative Custody. The Defendants do not contend that a written statement was provided Drayton. The Defendants' failure to provide Drayton with a written statement of reasons as required by *Wolff* constituted a denial of due process even if Drayton's placement in Administrative Custody was otherwise proper. The Court, therefore, holds that Drayton's placement in Administrative Custody on March 27, 1979 was accomplished in violation of his rights to procedural due process.

The Court is justified in making this finding on the present record. This is not a case where the Defendants have argued that they were unable to hold a prompt hearing because they lacked the necessary information. To the contrary, Defendant Patton sets forth in his affidavit that a hearing was held the day Drayton arrived. Those who conducted the hearing must have had reasons for their decision to place Drayton in Administrative Custody yet those reasons were not disclosed in writing to Drayton as required. In addition, the Defendants have not argued that there was any reason why Drayton could not be told of the reasons or evidence relied on. In short, the record before the Court reveals a complete disregard of Drayton's right to due process.

Although the Court has concluded that Drayton's due process rights were violated by the manner in which he was placed in Administrative Custody on March 27, 1979, the Court is unable to determine on this record which defendants are responsible for that deprivation, namely the people on the Hearing Committee who determined to place Drayton in Administrative Custody and perhaps any supervisory personnel who either directed that Drayton not be informed of the reasons in writing or have knowledge that Drayton was not informed and acquiesced in that omission. *See Hampton v. Holmesburg Prison Officials*,

546 F.2d 1077, 1082 (3d Cir. 1976). If Drayton desires to pursue this claim, he must at trial establish which of the Defendants is responsible for the deprivation.

■ The record also fails to disclose any valid reason for Drayton's confinement in Administrative Custody. Patton's affidavits state that the Hearing Committee made the decision, but does not say why it was made. Bureau of Correction documents submitted by Drayton, Exhibits A–1 to A–6 to document 113, indicate only that Drayton was transferred from Dauphin County Prison prior to his trial for murder for medical treatment and that he was a "security transfer." The memorandum of April 7, 1977 from the Commission of the Bureau of Correction relating to HVA cases provides for their confinement in Administrative Custody only when it is warranted under Administrative Directive 801. Administrative Directive 801 does not call for confinement in Administrative Custody because a prisoner has HVA status or because of generalized security concerns. Confinement in Administrative Custody is permitted only when an inmate (1) is alleged to have committed a Class 1 Misconduct upon the approval of the officer in charge "not routinely but based upon his assessment of the situation and the need for control" (2) is in investigative status when the officer in charge determines there is a threat of a serious disturbance or (3) requests self confinement. Administrative Directive 801 IV. B. 1, 3, 4. The Defendants having failed to present any evidence of a valid reason for Drayton's confinement in Administrative Custody from March 27, 1979 to April 12, 1979 are not entitled to proceed to trial on that issue since the undisputed facts of record disclose a violation of Drayton's rights as a matter of law. *See* Fed.R.Civ.P. 56. As with Drayton's other claim concerning this period of confinement, he must show which Defendants were responsible for the deprivation.

Drayton's second period of confinement in Administrative Custody began on May 29, 1979 and ended on December 26, 1979

with the exception of the period from June 5, 1979 to July 3, 1979 during which Drayton was in Disciplinary Custody. With respect to that period of confinement, the record reveals the following potential procedural due process violations: (1) the Defendants' failure to provide Drayton with a hearing as to his housing custody status until June 6, 1979, one week after Drayton arrived at Camp Hill, (2) the Defendants' failure to provide Drayton with an adequate statement of the evidence relied on and the reasons for the decision to place him in Administrative Custody and (3) the Defendants' failure to provide a meaningful review of Drayton's status while he was in Administrative Custody.

▇ In *Helms v. Hewitt*, 655 F.2d 487 at 500 (3d Cir. 1981), the Court of Appeals held that an inmate must be given a hearing prior to his confinement in Administrative Custody or, if exigent circumstances exist, within a reasonable time thereafter. Since at the time Drayton was received at Camp Hill on May 30, 1979 he was an unsentenced prisoner convicted of murder and was transferred because of his alleged participation in a disturbance at the Dauphin County Prison, the Court concludes that exigent circumstances existed permitting the Defendants to afford Drayton his hearing within a reasonable time after his arrival. The question is, therefore, whether 7 days is a reasonable time.

▇ In *Helms* the Court of Appeals stated that *Wright v. Enomoto*, 462 F.Supp. 397, 404 (N.D.Ca.1976), aff'd 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (mem.), required that a hearing be held within "72 hours of initial segregation, unless additional time is requested by the inmate." *Helms v. Hewitt*, 655 F.2d 487 at 498 No. 80–2393.[1] In *Helms* the Court of Appeals explained that the Supreme Court's summary affirmance of *Wright* could not be construed to mean that 72 hours was the

longest time that a hearing could be delayed. *Helms v. Hewitt*, 655 F.2d 487 at 499 No. 80–2393. In determining what is a reasonable period of time, the Court deems it appropriate to look to what time limit the Bureau of Correction imposes in the case of disciplinary hearings and to the practice in the federal system.

Administrative Directive 801, Part III. D.1. provides that a hearing in such cases must be held within 6 days after the inmate is notified of the charges against him. By order dated June 27, 1979, as amended July 2, 1981, this Court directed that hearings be provided to inmates confined in temporary disciplinary segregation at the United States Penitentiary at Lewisburg within 5 days of their segregation, unless exigent circumstances exist. *Jordan v. Arnold*, Civil No. 75–1334. Based on these facts, the Court concludes that a delay of one week in giving Drayton his hearing was unreasonable. On this record, however, the Court cannot determine which Defendants are responsible for the delay and Drayton, if he wishes to pursue that claim, must establish the identity of the Defendants responsible for the delay.

▇ The June 6, 1979 report of the Program Review Committee contains an adequate statement of reasons and evidence relied on to satisfy the procedural requirements of *Wolff*. Specifically, the notice states that Drayton was transferred from Dauphin County Prison following a disturbance there, that he had been convicted of first degree murder, and had additional charges pending against him in New Jersey. This statement adequately informed Drayton of the reasons for his placement in Administrative Custody. This conclusion is of little comfort to the Defendants because substantively those reasons are not sufficient to warrant confinement in Administrative Custody.

Although Administrative Directive 801 Part V.A provides that Administrative Cus-

---

1. The language *Wright* relied on by the Court of Appeals for this conclusion was that an inmate be provided "a fair hearing . . . not less than seventy-two (72) hours after placement in the maximum security unit unless the inmate requests, in writing, additional time in which to prepare a defense." *Wright v. Enomoto*, 462 F.Supp. at 404.

tody is for inmates requiring closer supervision than is provided in general population and Part VI.A.1. provides that the purpose of placing an inmate in Administrative Custody is to maintain the safety of the institution by segregating an individual who poses a threat to the other inmates or to the staff, those general provisions are qualified by the specific requirements of Part IV.B.1, 2 and 3 referred to above. The statement of reasons given by the PRC and the affidavit of the Warden of the Dauphin County Prison fail to establish that Drayton committed a Class 1 Misconduct, was in investigative status or requested confinement in segregation. Indeed, the Defendants have not sought to justify Drayton's confinement in Administrative Custody on any of those grounds. While in the absence of Administrative Directive 801 the reasons relied on by the Defendants may have been sufficient to warrant placing Drayton in Administrative Custody, see *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975), Administrative Directive 801 limits the discretion that the Defendants otherwise might have enjoyed and prevents them from confining an inmate in Administrative Custody unless one of the three criteria are met. *Helms v. Hewitt*, 655 F.2d 487 at 496 n.7 No. 80–2393. The only other provision relating to Administrative Custody of which the Court is aware is Administrative Directive 004 which is applicable only when the State Police are notified of a condition in the institution. The Defendants in this case do not purport to rely on that directive. The undisputed facts of record establish that Drayton was placed in Administrative Custody for reasons not permitted under applicable regulations and, therefore, his initial placement in that status on May 30, 1979, was in violation of his right to due process of law. The Defendants responsible for that deprivation are Bell and Marks, the members of the PRC, and Patton, who approved the decision.

Having determined that Drayton's initial placement in Administrative Custody was improper, the Court will now consider Drayton's contention that he was entitled to further procedural protection during the time he was in that status. In *Wright v. Enomoto*, 462 F.Supp. 397, 403–04 (N.D.Ca. 1976), *aff'd on other grounds*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (mem.), the Court indicated that the deprivation suffered by a prisoner placed in administrative segregation could be greater than that faced by an inmate placed in disciplinary custody because the term in administrative custody was potentially unlimited whereas a disciplinary custody term was limited usually to a maximum of 10 days. The Court, however, did not reach that question and, consequently, the Supreme Court's summary affirmance does not constitute the Supreme Court's adjudication on the question. Similarly, in *Helms* the Court of Appeals was not faced with the question of the additional protections, if any, to which a prisoner in Administrative Custody was entitled. The Court, however, did observe "we express our belief that indeterminate periods of confinement in Administrative Custody may require even greater protections (not unlike, perhaps, existing status reviews) than fixed term detention in Disciplinary Custody." *Helms v. Hewitt*, 655 F.2d 487 at 499 n.10 No. 80–2393.

Other courts, however, have reached the issue. In *United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 293 (E.D.Pa.1978), the Court held that an inmate confined in Administrative Custody in a behavioral adjustment unit was entitled to a periodic review according to objective criteria so that he could be released when such confinement was no longer authorized under the appropriate regulations. The reasons such periodic reviews are necessary are readily apparent. In *Mathews v. Elldredge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court stated that one factor to be considered in determining the amount of process due is the degree to which it would reduce the risk of an erroneous determination. In this case, Drayton could be confined in Administrative Custody only if he met one or more of the criteria under Administrative Directive 801. In the absence of periodic reviews of his status, there was a grave risk that he

would be confined in Administrative Custody longer than there was a need. In order to reduce that risk, the Court concludes that due process requires a periodic review of Drayton's status in Administrative Custody followed by a written statement of the evidence relied on and the reasons he was continued in Administrative Custody. *Accord Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975); *Grandison v. Howard*, Civil No. 78–1318 (W.D.Pa. October 8, 1980); *Mims v. Shapp*, 457 F.Supp. 247, 252 (W.D.Pa.1978); *U. S. ex rel. Hoss v. Cuyler*, 452 F.Supp. at 293.

The Bureau of Correction itself requires such hearings. Part III.G.4 of Administrative Directive 801 provides that the Program Review Committee shall interview an inmate in Administrative Custody at least once every thirty days.

> The determination of whether continued confinement is warranted will be based upon a review of the counsellor's notes and recommendations, psychological and psychiatric reports when available, recommendations of other staff and · their written observations regarding [the inmate's] attitude and actions and his attitude and actions during the interview. . . . When the Program Review Committee determines that continued confinement is warranted, the inmate shall be given a written statement of the decision and its rationale.

In purported compliance with this part of Administrative Directive 801, the Program Review Committee reviewed Drayton's status on a monthly basis from August 1 until November 28, 1979. On August 1, 1979, the reasons given by the PRC for Drayton's continued confinement were that Drayton was "a security risk and should remain in the [restrictive housing unit] in order to insure the safety and general welfare of the institutional staff." On August 29, 1979, the Committee stated that Drayton was "a security risk and should remain in the RHU in order to insure the safety and general welfare of the staff as well as other inmates." On October 3, 1979, the PRC found that Drayton was "a security risk

and should remain in the RHU for the good order of the institution and for the welfare of the staff and other inmates." On October 31, 1979, the PRC reported that Drayton was being held in Administrative Custody "for security reasons." The final report on November 28, 1979 just states that he will remain in Administrative Custody.

■ None of these reports set forth the evidence relied on by the Program Review Committee in reaching its determination that Drayton was a security risk or explains its reason for so concluding. As far as Drayton's procedural due process rights are concerned, it is immaterial whether in fact sufficient reason existed to maintain Drayton in Administrative Custody. Drayton's procedural due process rights require that he be informed of those reasons in a meaningful manner. Those rights are important because, as the Supreme Court indicated in *Wolff*, written statement of reasons, subject to possible scrutiny by the courts, help to insure that correction officials will act fairly. *Wolff v. McDonnell*, 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974). The Court, therefore, concludes that the members of the Program Review Committee who reviewed Drayton's status on August 1, 1979 and thereafter, as well as Superintendent Patton, violated Drayton's procedural due process rights. Those Defendants are Bell, Petsock, with respect to the August 1, 1979, August 29, 1979 and the October 3, 1979 reports, Defendant Petsock with respect to the October 31, 1979 report and Defendants Petsock and Palakovich with respect to the November 28, 1979 report. The Defendants on the Program Review Committee violated Drayton's rights in that each of them failed to provide Drayton with the required statement of evidence relied on and reasons for the decision to continue him in Administrative Custody. Defendant Patton violated Drayton's right because in his capacity as superintendent he approved the insufficient notices that were given Drayton. See *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976).

■ Drayton's final contention with respect to his confinement in Administrative Custody is that it was improper for substantive reasons. As indicated above, Drayton's initial placement in Administrative Custody was improper because it was not in accordance with Administrative Directive 801. While confined at Camp Hill, Drayton received a disciplinary infraction on June 5, 1979 for "disrupting institutional routine by creating a disturbance in the RHU" for which he served a term of 30 days in Disciplinary Custody. The Defendants have not contended that Drayton was disciplined for his alleged conduct at Dauphin County Prison or that his behavior while in Administrative Custody evidenced any need for his continued confinement there for a period of six months after he served his term of Disciplinary Custody. With the exception of an incident involving Drayton's failure to return law books, for which received a reprimand on September 10, 1979, and playing his radio too loudly, neither involving physical confrontations between Drayton and the correctional staff, Drayton's conduct and attitude while in Administrative Custody was of no concern to the Defendants.

Custody evaluations prepared on Drayton from July 3, 1979 until November 28, 1979, reveal that in matters of cleanliness of both himself and his cell he was satisfactory, that Drayton was careful with both his own property and property issued to him, that his response to authority was good most of the months and fair in two monthly reports, that his response to other inmates was good, although he was loud on occasion, and that his compliance with rules and regulations was good in all but one report in which it was described as fair. The general comments and recommendations were that Drayton had experienced a fair to good quarters adjustment. As late as August 29, 1979, his general attitude was described as cooperative and quiet and he had caused no trouble. The final report on November 28, 1979 revealed that Drayton had "experienced good behavior" and that he was no problem in the Restrictive Housing Unit.

In the face of this evidence of Drayton's conduct while in Administrative Custody, Defendants have failed to come forward with evidence to raise a material issue of fact as to whether Drayton was properly confined in Administrative Custody until December 26, 1979. While there may be evidence that the Defendants are relying on to support their position, successfully to oppose the motion for summary judgment they must come forward with that evidence and show that there is an issue of material fact to be tried. *See DeLong Corp. v. Raymond Intern, Inc.*, 622 F.2d 1135, 1142 (3d Cir. 1980). The Defendants have utterly failed to discharge this obligation and on the basis of the record before it, the Court concludes that Drayton's confinement in Administrative Custody from May 30, 1979 to June 5, 1979 and from July 3, 1979 to December 26, 1979 was improper. From June 5, 1979 to July 3, 1979 Drayton was in Disciplinary Custody because of an institutional rule infraction and Drayton does not attack the validity of that confinement. The Defendants who violated Drayton's rights are the members of the Program Review Committee set forth earlier and Defendant Patton because they were the ones who were responsible for Drayton's continued confinement in Administrative Custody.

These Defendants as well as the Defendants who failed to provide Drayton with a written statement of reasons for his confinement in Administrative Custody during his first stay at Camp Hill in March and April 1979 and the Defendants responsible for placing Drayton in Administrative Custody for that period are entitled to immunity from liability for damages unless Drayton's constitutional rights were clearly established at the time of their conduct, they knew or should have known of the right, and knew or should have known that their conduct violated the constitutional norm or unless they acted with the malicious intention to cause a deprivation of constitutional rights or other injury to Drayton. *See Winsett v. McGinnes*, 617 F.2d 996, 1009 (3d Cir. 1980) (en banc). Drayton's motion did not place the Defendants on notice that he sought to determine the issue of the Defendants' immunity by summary judgment.

Although Drayton's reply brief argues that Defendants are not entitled to immunity, the Defendants have not had a fair opportunity to address the issue. The Court, therefore, will not at this time determine whether the Defendants are entitled to immunity from damages.

An appropriate order will be entered.