968 F.2d 1210
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
David A. JOSSELYN, Plaintiff, Appellant,
v.
Philip POIRIER, et al., Defendants, Appellees.
 No. 92-1014.
 United States Court of Appeals,
First Circuit.
 July 27, 1992
 
 Appeal from the United States District Court for the District of Massachusetts
 David A. Josselyn on brief pro se.
 Nancy Ankers White, Special Assistant Attorney General and Charles M. Wyzanski, Senior Litigation Counsel, Department of Correction, on Memorandum of Law in Support of Summary Disposition.
 D.Mass.
 AFFIRMED.
 Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Boudin, Circuit Judge.
 Per Curiam.
 
 
 1
 Plaintiff/appellant, David A. Josselyn, appeals the grant of summary judgment in favor of the prison officials against whom he brought an action, pursuant to 42 U.S.C. § 1983. We affirm.
 
 
 2
 Josselyn, a prisoner at the Massachusetts Correctional Institution (MCI) at Norfolk, was suspected of attempting to escape in the early morning hours of September 15, 1989. That evening he was transferred to MCI at Cedar Junction.
 
 
 3
 In March 1990, he filed suit with claims stemming from the investigation of the escape attempt and his transfer. Eventually, the parties cross-moved for summary judgment with the prison officials prevailing.
 
 I.
 
 4
 Before turning to the underlying merits, we dispose of some preliminary complaints appellant raises on appeal. First, Josselyn contends that he did not have adequate notice that defendants' motion would be treated as one seeking summary judgment. This argument is specious. Defendants' motion was permissibly phrased in the alternative, as a motion to dismiss or for summary judgment.[1] The motion itself gave notice to Josselyn and he was given a reasonable opportunity to respond, which he did, with an opposition, a cross-motion for summary judgment, and accompanying memorandum.
 
 
 5
 Second, Josselyn argues that the district court erred in failing to hold a hearing before granting summary judgment. The court properly may grant summary judgment, without an evidentiary hearing or oral argument, "if no dispute over material fact exists and a trial or hearing would not enhance its ability to decide the [remaining legal] issue." Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988); see also Fed. R. Civ. P. 43(e) (court may "hear" motion on affidavits). As discussed infra, contrary to Josselyn's contention, there is no genuine issues of material fact and no necessity for a hearing.
 
 
 6
 Third, Josselyn complains that the court's grant of summary judgment was not accompanied by any supporting memorandum. Findings of fact and conclusions of law are unnecessary on decisions of summary judgment motions. Fed. R. Civ. P. 52(a). The court endorsed, as "allowed," the defendants' motion, which sought summary judgment based on the reasoning set forth in their memorandum. The basis for the court's ruling, therefore, is apparent from the record. While a supporting memorandum is useful to a reviewing court, the absence of such is not fatal in this case. Domegan v. Fair, 859 F.2d 1059, 1065-66 (1st Cir. 1988).
 
 II.
 
 7
 We turn to the merits of this appeal. We review the grant of summary judgment de novo. See, e.g., Rodriques v. Furtado, 950 F.2d 805, 808 (1st Cir. 1991). "Summary Judgement is appropriate only if there is no genuine dispute as to material fact and the moving party is entitled to judgment as a matter of law." Id. at 809. We "review the record, together with all reasonable inferences therefrom, in the light most favorable to the non-moving party, here appellant." Id.
 
 
 8
 Unless otherwise indicated, these facts are essentially undisputed. On September 15, 1989, at approximately 8:45 a.m., after a night of heavy rain, prison officials found a rope made of prison bedsheets hanging from a wall at Norfolk, a hole, approximately 21/2 feet by 11/2 feet, cut in an adjacent inner perimeter chain-link fence, and, close by, a pair of needle nose pliers. The pliers had pieces of conduit pipe attached to the ends with blue electrical tape. The bedsheets had Josselyn's laundry identification number on them. Josselyn's room was searched that afternoon and several articles of his clothing, including sneakers, were found to be soaking wet. The sneakers had scuff marks on the inner foot area.
 
 
 9
 Defendants contend, although Josselyn now denies, that Josselyn's hot pot had blue electrical tape on it, identical to the tape used to connect the pliers and pipe.[2]
 
 
 10
 Josselyn was placed in Norfolk's segregation unit and a visual body cavity search was done. At approximately 9:30 p.m., he was transferred to Cedar Junction, where he was placed in Awaiting Action (AA) status in that prison's segregation unit. On October 25, 1989, a classification meeting was held. The classification board recommended that Josselyn remain in AA status pending the results of the investigation into the attempted escape and related disciplinary action.
 
 
 11
 On November 10, 1989, Josselyn received a copy of the disciplinary report. This report related the facts previously noted regarding the homemade rope, hole in the perimeter fence, pliers, and pipe. The report also stated that interviews were conducted, at which Josselyn was identified as the inmate who had attempted the escape. Although the attempted escape occurred between 2 and 3 a.m., the inner perimeter fence and the wall were lit. According to the report, some of the inmates who were interviewed recited that Josselyn climbed out the fire escape window in his room, crawled along the fence, cut through the inner perimeter fence, and crawled across the "dead zone." These interviewees further recited that, with the assistance of broomsticks with blocks attached, Josselyn placed a hook, with a sheet attached, to the top of the wall and attempted to climb the wall. According to the report, when the attempt failed, Josselyn moved the hook and sheet down to a different area, tried and again failed to climb the wall, then crawled back through the "dead zone" and returned to his unit. The report recited that every article of evidence was either directly tied to Josselyn or he had access to that material and was seen with it.
 
 
 12
 After two continuances at Josselyn's request so that counsel could be present and one continuance due to the reporting officer's illness, the disciplinary hearing was held on February 2, 1990. The investigating officer testified. Because the escape incident had been referred to the district attorney's office for possible prosecution, Josselyn invoked his fifth amendment right to remain silent and did not testify in his own behalf. Josselyn was represented by a law student, who argued that, on the morning after escape attempt, it was damp outside and that Josselyn had been out jogging and had made no attempt to hide his wet clothes, which were laying around his room.
 
 
 13
 On February 12, 1990, Josselyn was found guilty of attempted escape. He was given 15 days in isolation and the disciplinary board recommended that Josselyn be reclassified to higher security, placed in the departmental segregation unit (DSU), and lose 1000 days of good time credit. Josselyn appealed the recommended loss of good time credit. The superintendent recommended, and the commissioner ordered, that 500, rather than 1000, good time days be forfeited.
 
 
 14
 An initial DSU review was held on April 20, 1990. The DSU board recommended a 2 year placement in DSU. Josselyn was ultimately released to the Cedar Junction general population on July 9, 1991.
 
 III.
 
 15
 On appeal, Josselyn argues that there exist 5 genuine issues of material fact, which preclude entry of summary judgment in the defendants' behalf.
 
 A.
 
 16
 Josselyn claims that when he was taken to Norfolk's segregation unit, prior to his transfer to Cedar Junction, he had to remove all of his own clothes, underwent a visual body cavity search, and was left naked for several hours. He claims that these actions amounted to punishment and an unreasonable search and seizure.
 
 
 17
 Contrary to Josselyn's contention, this claim does not present any genuine issue of material fact, for even accepting these assertions as true, they would not affect the outcome of the case under the applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (reciting that only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment). Balancing the significant and legitimate security interests of the prison against the privacy interest of the inmate, a visual body cavity search conducted of an inmate suspected of an attempted escape does not constitute punishment nor an unreasonable search and seizure in violation of the Constitution. Bell v. Wolfish, 441 U.S. 520, 558-60 (1979) (holding that probable cause is not necessary to conduct a visual body cavity search of an inmate after a contact visit with a person from outside the institution); Cookish v. Powell, 945 F.2d 441, 446 n.7 (1st Cir. 1991) (concluding that a visual body cavity search conducted when transferring inmates after a prison disturbance is not an unreasonable search); Arruda v. Fair, 710 F.2d 886, 886-88 (1st Cir.) (holding that a visual body cavity search conducted when an inmate enters or leaves his unit on his way to or from the prison law library and infirmary, and after he receives visitors in the unit's visiting rooms does not violate the Fourth or Eighth Amendments), cert. denied, 464 U.S. 999 (1983). The fact that, according to Josselyn, after the search was completed, he spent several hours, naked in a cell in Norfolk's segregation unit, before he was given a jumpsuit and slippers for his transfer to Cedar Junction, in our view, does not elevate this claim into a constitutional violation.
 
 B.
 
 18
 Josselyn claims that the defendants negligently lost some of the property that he was forced to leave behind, including the clothing he had been wearing just before his transfer to Cedar Junction. Again, as with the claim just discussed, this claim does not present any genuine issue of material fact, precluding entry of summary judgment in defendants' favor. "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328 (1986) (emphasis in the original). Josselyn's contention that the defendants' refusal to reimburse him for the replacement cost of the lost property is punishment for his attempted escape does not advance his claim of a federal constitutional violation. We express no view as to the existence of any state remedy.
 
 C.
 
 19
 Josselyn complains of his transfer to AA status at Cedar Junction without a hearing and of the 7 month delay before a DSU review occurred. Again, this contention presents no factual dispute and, accepting these facts as asserted by Josselyn, we conclude defendants are entitled to judgment as a matter of law.
 
 
 20
 The transfer of an inmate to more restrictive quarters pending investigation of misconduct charges does not impinge on any liberty interest protected by the Due Process Clause in and of itself. Hewitt v. Helms, 459 U.S. 460, 468 (1983). A state, however, may create a substantive liberty interest protected by the Due Process Clause through statutory or regulatory law. Id. at 469. Josselyn argues that Massachusetts has done so here via the department of correction's regulations related to the use of segregation and that the defendants' alleged failure to comply with those regulations violated his due process rights.
 
 
 21
 "[A] State creates a protected liberty interest by placing substantive limitations on official discretion." Olim v. Wakinekona, 461 U.S. 238, 249 (1983). "[O]ur method of inquiry" is "to examine closely the language of the relevant statutes and regulations." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 461 (1989). If the relevant regulations give the defendant prison officials essentially unfettered discretion to place an inmate in AA status, no liberty interest has been created.
 
 
 22
 We reviewed the Massachusetts Department of Corrections "awaiting action status" detention regulations in Stokes v. Fair, 795 F.2d 235 (1st Cir. 1986). In Stokes, we concluded that the regulations did create a liberty interest protected by the Due Process Clause because, as then written, they permitted prison officials to place an inmate in AA status only upon occurrence of certain conditions, i.e., pending
 
 
 23
 (a) a hearing on a disciplinary offense by the inmate
 
 
 24
 (b) an investigation of a possible disciplinary offense by the inmate
 
 
 25
 (c) a transfer or a reclassification of the inmate to a higher custody status, or
 
 
 26
 (d) imposition of isolation time sanction on the inmate when the inmates's continued presence in the general population poses a serious threat to persons, property, or the security of the institution.
 
 
 27
 Id. at 237.
 
 
 28
 Subsequent to our decision in Stokes, the relevant regulations were revised and, at the time of appellant's transfer to Cedar Junction and placement in AA status, the relevant regulation, Mass. Regs. Code tit. 103, § 430.21 (1987), read:
 
 
 29
 (1) At the discretion of the Superintendent or his/her designee, and subject to any applicable review requirements, an inmate who is under investigation for a possible disciplinary offense, or who has been charged with or found guilty of a disciplinary offense, may be placed on awaiting action status at the institution where he/she is then confined. Such status may include more restrictive confinement as deemed appropriate by the Superintendent or his/her designee.
 
 
 30
 (2) An inmate who is under investigation for a possible disciplinary offense, or who has been charged with or found guilty of a disciplinary offense, may be transferred to another Massachusetts institution, or an out of state institution prior to a classification hearing. An inmate so transferred may, at the discretion of the Superintendent or his/her designee at the receiving institution, and subject to any applicable review requirements, be placed on awaiting action status. Such status may include more restrictive confinement as deemed appropriate by the Superintendent or his/her designee.
 
 
 31
 We interpreted the pre-1987 regulations as limiting the prison officials' discretion to place an inmate in AA status to those instances expressly set out in the regulations, one of which was pending investigation of a possible disciplinary offense. We note that the 1987 regulation permitted the prison officials to transfer an inmate, who is under investigation for a possible disciplinary offense, prior to a classification hearing and to place that transferred inmate in AA status "at the discretion of the Superintendent or his/her designee." We need not, and do not, determine whether this revision worked a substantive change in an inmate's liberty interest in remaining in the general prison population. We will assume, consistent with our Stokes analysis, that an inmate has a reasonable expectation that he will be placed in AA status only if he is (a) under investigation for, (b) has been charged with, or (c) found guilty of a disciplinary offense. In other words, we will assume that (a)(b) and (c) is an exhaustive list of the conditions permitting placement in AA status. But cf. Berrier v. Allen, 951 F.2d 622, 625 (4th Cir. 1991) (finding no liberty interest created where language of regulations did not explicitly prohibit prison officials from confining inmate in administrative segregation unless one of the four enumerated situations existed).
 
 
 32
 Assuming that the department of corrections' regulations created a liberty interest, there was, nonetheless, no due process violation. One of the expressed substantive predicates required for placing an inmate in AA status was present in Josselyn's case; he, in fact, was under investigation for a possible disciplinary offense when he was placed in AA status. See Smith v. Massachusetts Dep't of Correction, 936 F.2d 1390, 1397 (1st Cir. 1991) (where one of the requisite substantive predicates for placing an inmate on AA status was present, there was no due process violation). That he was transferred to Cedar Junction and placed in AA status prior to a hearing, likewise, raises no due process concern, either as a matter of the Due Process Clause itself, Hewitt v. Helms, 459 U.S. at 472 (due process is satisfied by an informal, non-adversary review within a reasonable time after confinement to administrative segregation), or as a matter of any state-created liberty interest as § 430.21(2) permitted the transfer and placement in AA status prior to a classification hearing.
 
 
 33
 It appears that Josselyn's real complaint is his suggestion that the 7 month delay, between his transfer to Cedar Junction and his DSU review and reclassification, during which time he remained in AA status, was an impermissible attempt by the defendants to use AA status as a substitute for a formal DSU classification. The Court, in Hewitt v. Helms, 459 U.S. at 477 n.9, noted:
 
 
 34
 administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates.
 
 
 35
 As in Hewitt, the record in this case "is sufficient to dispel any notions that the confinement was a pretext." Id.
 
 
 36
 Josselyn was transferred on September 15, 1989. The regulations provided that when a disciplinary investigation is pending, an initial classification hearing, consisting "only of an evaluation of the inmate's security requirements and programmatic needs," shall be held within 20 working days of the transfer. Mass. Regs. Code tit. 103, § 420.09(3)(b) (1987). The regulations also provided, however, that "[a]11 procedural time limits set forth in these rules and regulations are directory and may be waived by the Superintendent or the Commissioner or their designees." Mass. Regs. Code tit. 103, §§ 420.12, 430.23 (1987). On September 18, 1989, Josselyn was notified that the Superintendent had ordered an investigation and was waiving all procedural time limits. Josselyn's status was reviewed thereafter every 7 days and Josselyn was notified that the investigation was continuing.
 
 
 37
 On October 25, 1989, the initial hearing referred to in § 420.09(b)(3) was held, with the board recommending that Josselyn remain in AA status pending the disciplinary investigation.[3] Thereafter, and in conformity with regulations which became effective while he was in AA status, Josselyn's status was reviewed every 15 days. Mass. Regs. Code tit. 103, § 421.08(3) (1989).
 
 
 38
 The disciplinary investigation was completed on November 10, 1989. After two continuances at Josselyn's request and one due to the reporting officer's illness, the disciplinary hearing was held on February 2, 1990. Josselyn was found guilty on February 12, 1990. He appealed the board's recommended recapture of good time. On March 22, 1990, the Commissioner approved the recommendation of the Superintendent that 500 days of good time be forfeited. Thereafter, Josselyn's DSU review occurred on April 20, 1990.
 
 
 39
 This chronology suggests a steadily progressive disposition of Josselyn's classification status and not an impermissible attempt by the defendants to use Josselyn's AA status as a substitute for a formal DSU classification, in violation of any due process right.
 
 D.
 
 40
 Josselyn complains that the disciplinary board relied on information from confidential informants without assessing the informants' reliability or the credibility of the information.
 
 
 41
 Because the disciplinary hearing subjected him to the loss of a state-created liberty interest in good time credits, Josselyn was entitled to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created [liberty] right is not arbitrarily abrogated." Wolff v. McDonnell, 418 U.S. 539, 557 (1974); see also Langton v. Berman, 667 F.2d 231, 233 (1st Cir. 1981) (same). The issue, therefore, is whether due process requires, at a minimum, an independent assessment by the disciplinary board of the reliability of confidential informants and the credibility of that information.[4]
 
 
 42
 Among the minimum requirements of due process, as established by Wolff, is a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken. Wolff v. McDonnell, 418 U.S. at 564.
 
 
 43
 [T]he provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission.
 
 
 44
 Id. at 565.
 
 
 45
 Although the Supreme Court has not spoken specifically on the issue of the required procedures when confidential informants are used, some courts have interpreted this requirement of a written statement by the factfinders as to the evidence relied upon as thereby encompassing a requirement that a disciplinary committee have some evidentiary basis upon which to determine for itself that an informant's story is probably credible. See, e.g., Hensley v. Wilson, 850 F.2d 269, 277 (6th Cir. 1988).
 
 
 46
 [U]nless the committee makes an independent determination about what the facts of the alleged misconduct are by deciding, minimally, that the hearsay information has been supplied by a reliable informant, it is merely recording the findings made by the investigating officer who has made a determination about the informant's reliability, without making any determination for itself about the informant's reliability or even the basis for the investigator's opinion that informant is reliable. To proceed in that fashion is not fact finding. It is recordkeeping.
 
 
 47
 Id. at 276; see also Kyle v. Hanberry, 677 F.2d 1386, 1389-90 (11th Cir. 1982) (same); Helms v. Hewitt, 655 F.2d 487, 502 (3d Cir. 1981) (same), rev'd on other grounds, 459 U.S. 460 (1983). But see Sanchez v. Miller, 792 F.2d 694, 702 (7th Cir. 1986) (while requiring an indicia of reliability is not inconsistent with Wolff, it is not compelled by it), cert. denied, 479 U.S. 1056 (1987).
 
 
 48
 Three times in the past, we have visited the issue of the procedures required when confidential informants are used. In Gomes v. Travisono, 510 F.2d 537, 540 (1st Cir. 1974), we reviewed rules governing disciplinary hearings devised under a consent decree and adopted as law by the state of Rhode Island the so-called Morris rules. The Morris rules required that any decision arrived at must be based on substantial evidence manifested in the record of the disciplinary proceeding and that
 
 
 49
 if any of the facts establishing a Board determination are derived from an unidentified informant: (1) the record must contain some underlying factual information from which the Board can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement in language that is factual rather than conclusionary [sic] and must establish by its specifity [sic] that the informant spoke with personal knowledge of the matters contained in such statement.
 
 
 50
 Id.
 
 
 51
 We stated in Gomes that this requirement was
 
 
 52
 aimed at preventing arbitrary determinations, which is the major thrust of Wolff, which commands "a written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. If the written statement is intended to withstand scrutiny and guard against misunderstanding, it cannot indicate reliance on speculation or on facts not in the record.
 
 
 53
 Id. Some circuit courts have used this language from Gomes to support a determination that federal constitutional due process, irrespective of any state law, is the source of a requirement that a disciplinary board independently determine the reliability of a confidential informant and the credibility of the informant's information. See, e.g., Kyle v. Hanberry, 677 F.2d at 1390; Helms v. Hewitt, 655 F.2d at 502. But see Sanchez v. Miller, 792 F.2d at 702 n.12 (expressing doubt that Gomes had concluded that an independent reliability/credibility determination was required as a matter of federal constitutional law).
 
 
 54
 Our own post-Gomes opinions visiting this issue, however, reveal a less certain conclusion. In Langton v. Berman, 667 F.2d at 235, and McLaughlin v. Hall, 520 F.2d 382, 384-85 (1st Cir. 1975), we declined to decide whether and how, as a constitutional requirement, a board must make an independent inquiry into the reliability of an informant and the credibility of its information. Our last word on this subject reiterated our preference, as voiced in Wolff, that the development of specific procedural requirements beyond those enumerated in Wolff be left in the first instance to the sound discretion of corrections authorities. Langton v. Berman, 667 F.2d at 235. At the same time, however,
 
 
 55
 [w]e continue to advise them to follow Wolff 's mandate to devise regulations to assure that the disciplinary board's procedure is adequate to enable it reasonably to conclude that any confidential information upon which it acted was reliable. We say this, however, without committing ourselves as to what must be open for our review.
 
 
 56
 Id.
 
 
 57
 While we remain cognizant of the "need to afford some protection against arbitrary or vindictive actions by prison officials stemming from unreliable unidentified or even nonexistent informants," id., this case does not require resolution of the underlying constitutional premise. We conclude in any event that no due process violation occurred. That is because those courts which have accepted this independent assessment as a minimum due process requirement conclude that due process is violated when the only evidence offered against an inmate in a disciplinary hearing and relied upon by the board is a hearsay recital by an investigating officer of an uncorroborated report of an unidentified informant. See, e.g., McCollum v. Miller, 695 F.2d 1044, 1049 (7th Cir. 1982); Kyle v. Hanberry, 677 F.2d at 1390-91; Helms v. Hewitt, 655 F.2d at 501-03; see also Baker v. Lyles, 904 F.2d 925, 933 (4th Cir. 1990) ("[t]his is not a case where the only evidence before the prison tribunal was the hearsay statement of an unidentified informant"); cf. Hensley v. Wilson, 850 F.2d at 276-77 (due process requires an independent determination by a disciplinary committee of a confidential informant's reliability where prisoner misconduct is found upon evidence consisting entirely, or even substantially, of the statement of an investigating officer that he has been told by confidential informants that the misconduct occurred); McCollum v. Williford, 793 F.2d 903, 905 (7th Cir. 1986) (a finding of reliability must clearly be made in any disciplinary proceeding that relies primarily, but not necessarily exclusively, on confidential informants).
 
 
 58
 Accepting as true, as we must in reviewing this grant of summary judgment in defendants' favor, Josselyn's contention that the disciplinary board in this case did not make an independent assessment of the reliability of the confidential informants or the credibility of their information, it is, nonetheless, equally true, contrary to Josselyn's attempt to portray it otherwise, that the board's determination of his guilt was not based solely, or even substantially, on that information.
 
 
 59
 The investigating officer, Philip Poirier, did testify that approximately 40 inmates were interviewed and that none had been informants in the past. Poirier also testified that of these 40 inmates, approximately 8 implicated Josselyn in the escape attempt and, of these 8 inmates, several were eyewitnesses who saw Josselyn attempt to climb the wall. In addition to these informant statements, however, there was much physical evidence--
 
 
 60
 conduit pipe attached with blue electrical tape to pliers and recovered just short of the inner perimeter fence;
 
 
 61
 the nose of the pliers containing a galvanized material, which matched the chain link fence;
 
 
 62
 poles, fashioned out of broomsticks and blocks, connected by blue electrical tape, found at the base of the wall in the inner perimeter area, where the rope was attached;
 
 
 63
 the escape rope fashioned from prison bedsheets and stamped with Josselyn's laundry identification number 533;
 
 
 64
 Josselyn's laundry bag and pillowcase stamped with his ID number 533, retrieved from his room;
 
 
 65
 saturated sneakers with scuff marks on the inner foot area and a saturated sweatshirt found in Josselyn's room and identified by Josselyn as belonging to him; and
 
 
 66
 a hot pot with blue electrical tape on the cord and Josselyn's name printed on the pot and identified by Josselyn as his.
 
 
 67
 The disciplinary board found "[t]he information gathered from inmate interviews, coupled with the physical evidence confiscated and the oral testimony obtained from the reporting officer shows the board an overwhelming pattern, clearly indicative of the fact that [Josselyn] was directly involved with an attempted escape."
 
 
 68
 This case is unlike, for example, McCollum v. Miller, 695 F.2d 1004, in which four inmates were charged with extortion and pressuring other inmates to perform homosexual acts and the only evidence was an unsworn report of an investigating officer, not called as a witness, which detailed statements of unidentified confidential informants. There was no question in the present case, with the gaping hole in the fence and the rope, pipe, pliers and poles found nearby, that an escape had been attempted.
 
 
 69
 This case is also unlike Helms v. Hewitt, 655 F.2d 487, in which an inmate was found guilty of striking an officer during a prison melee solely on the basis of a hearsay account of an unidentified informant's uncorroborated story. Putting aside the investigating officer's testimony that 8 inmates implicated Josselyn, including several who claimed to have witnessed his attempt to scale the wall, there was physical evidence linking Josselyn to the attempted escape the rope stamped with his laundry ID number, his saturated clothing, including sneakers with scuff marks on the inside foot area, and blue electrical tape, found on an item in his room, that was the same type as used on the escape tools.
 
 
 70
 Despite the absence of any reference by the disciplinary board in its report that it had independently determined that the confidential informants were reliable and their information credible in identifying Josselyn as the perpetrator, the physical evidence recovered obviously provided some corroboration. Kyle v. Hanberry, 677 F.2d at 1391 (the inquiry by the disciplinary board into the reliability of informants may be diminished or even satisfied where there is corroborating physical evidence of the information provided). In any event, because the disciplinary board did not rely solely, or even substantially, on any informant's identification of Josselyn as perpetrator of the attempted escape, we conclude that no due process violation occurred by the board's alleged failure to make an independent assessment of the reliability of the confidential informants or the credibility of their information.
 
 
 71
 To be sure, Josselyn downplays the significance of the physical evidence. He suggests that his bedsheets were stolen; his clothing was wet because, he claims, he was out jogging that morning; his sneakers were worn from playing handball; his hot pot had no blue electrical tape on it; and that the entire general prison population had access to items such as the pipe, poles, and tape. But a court does not review de novo a disciplinary board's finding of guilt. Due process is satisfied if "some evidence" supports the decision by the board to revoke good time credits. Superintendent, Massachusetts Correctional Inst. v. Hill, 472 U.S. 445, 455 (1985) (declining to decide whether due process requires judicial review of prison disciplinary proceedings, but finding that state statutory law provided such review). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." Id. There certainly was some evidence in the record, apart from any informant statements, that supported the board's conclusion and we are not required to set aside decisions of prison administrators that have some basis in fact. Id. at 455-56. "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." Id. at 457.
 
 E.
 
 72
 Finally, Josselyn argues that the prison policy which requires DSU inmates to wear handcuffs and leg shackles when moving to one location to another is an arbitrary and unconstitutional form of punishment because, according to Josselyn, he has no prison record of violence. Even accepting as true Josselyn's contention as to his prison record, the restraint policy is reasonably related to a legitimate government purpose of prison security. There is no constitutional deprivation.
 
 IV.
 
 73
 For the foregoing reasons, we affirm the grant of summary judgment in defendants' favor.
 
 
 74
 Affirmed.
 
 
 
 [1]
 There were actually two such motions. The first was filed in February 1991 with an accompanying memorandum. This motion recited that it was filed on behalf of 13 named defendants. There were, however, 16 named defendants and the omission of 3 names appears to have been inadvertent. Josselyn filed his opposition and cross-motion in March 1991
 In October 1991, the defendants filed a second motion, this one reciting all 16 names. This subsequent addition of earlier-omitted names did not prejudice Josselyn, as thissecond motion relied on the previously filed memorandum. In any event, Josselyn had an opportunity to file a further response, if it was warranted, but did not do so. The district court granted summary judgment in defendants' favor on November 26, 1991, with judgment entering on December 20, 1991.
 
 
 [2]
 Josselyn did not contest the existence of the blue electrical tape on his hot pot at the disciplinary hearing and a photograph showing the hot pot with blue tape attached to its cord was admitted into evidence at the hearing
 
 
 [3]
 That this initial classification hearing apparently was held on the 27th working day after Josselyn's transfer, rather than within 20 working days as specified in § 420.09(3)(b), does not implicate the Due Process Clause. Regulations which embody only procedural time limits do not create a liberty interest. Smith v. Massachusetts Dep't of Correction, 936 F.2d at 1397 n.11; see also Hewitt v. Helms, 459 U.S. at 471 (the mere creation of a procedural structure to regulate the use of segregation does not indicate the existence of a protected liberty interest); id. at 472 (due process satisfied by informal, non-adversary review within a reasonable time after confinement to administrative segregation) (emphasis added)
 And, we note, despite the regulation's phrasing that the hearing "shall be held within twenty (20) working days of such a transfer," the regulation itself cannot be read as creating some enforceable constitutional due process entitlement to a hearing within that time, as the regulations expressly provided that the procedural time limits were directory and waivable, § 420.12, and, were, in fact, waived in Josselyn's case. Cf. Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 827-28 (1st Cir. 1987) (due process rights were violated by 2-day delay in post-transfer hearing).
 
 
 [4]
 Some of the cases in this area freely interchange reliability and credibility and so may refer to the assessment as one of the credibility (rather than reliability) of theinformant and the reliability (rather than credibility) of the evidence. We infer no meaningful difference in the interchange